## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| GEORGE WILSON, THORNELL BROWN, AARON FOWLER, CASEY JENKINS, CURTIS SIMPKINS, and CHARLES BAKER<br><br>on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>J.B. HUNT TRANSPORT, INC.,<br><br>     Defendant. | Case No.: 5:21-cv-05194-TLB<br><br>**SECOND CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs George Wilson, Thornell Brown, Aaron Fowler, Casey Jenkins, Curtis Simpkins, and Charles Baker ("Plaintiffs") bring this Class Action Complaint against J.B. Hunt Transport, Inc. ("Defendant"), individually and on behalf of all others similarly situated ("Class Members"), and allege, upon personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

1.　　Plaintiffs bring this class action against Defendant for its failure to properly secure and safeguard personally identifiable information that Defendant required from job applicants as a condition of potential employment, including names and Social Security numbers (collectively, "personally identifiable information" or "PII").

2.　　Plaintiffs also allege that Defendant failed to provide timely, accurate, and adequate notice to Plaintiffs and Class Members that their PII had been exposed. Defendant failed to inform Plaintiffs and Class Members of precisely what types of personally identifiable information was unencrypted and is now in the possession of unknown third parties.

3.　　According to its website, "[w]ith nearly 60 years of industry experience,

1

[Defendant] has grown from five trucks and seven trailers to a Fortune 500 company providing a variety of services for customers throughout the continental United States, Canada, and Mexico."[1] Defendant  has more than 30,000 employees and generates approximately $10 billion in annual revenue.[2]

4.      Defendant's prospective employees, current employees, and former employees entrust them with an extensive amount of their PII. Without explanation or disclosure, Defendant retains this information – even after any employment relationship with Defendant ends, or in the case of prospective employees, even if they are not hired to work for Defendant.

5.      From August 17, 2020 to July 2, 2021, this PII was continuously exposed by Defendant and accessed by unknown, unauthorized actors due to the way Defendant configured third-party software that it used to store driver applications and accompanying PII (the "Data Breach").

6.      During the Data Breach, unauthorized actors had unfettered access to "the Microsoft Power Apps portal used by J.B. Hunt to create driver applications,"[3] resulting in the exposure of the PII of more than 231,000 individuals who applied to be drivers for Defendant.

7.      On or around August 23, 2021, reports of the Data Breach began surfacing on the Internet when UpGuard, a private company dedicated to securing the sensitive data of organizations and researching security vulnerabilities, published a comprehensive report disclosing multiple data exposures resulting from Microsoft Power Apps portals configured to

---

[1] *See* https://www.jbhunt.com/our-company (last visited Jan. 18, 2022).

[2] *See* https://www.jbhunt.com/blog/2021/08/60-our-people (last visited Jan. 18, 2022).

[3] *See* https://apps.web.maine.gov/online/aeviewer/ME/40/108cd83a-7b5b-48f1-910b-1a8391313bc6/20426490-1a44-47b0-afb0-2b8b9ab39437/document.html (last visited Jan. 18, 2022).

allow public access.[4]

8.      Prior to the publication of its report, UpGuard notified several entities of exposures involving personal information, including Defendant.

9.      Defendant has not publicly reported when it first learned of the Data Breach, but UpGuard reported that it first notified Defendant of its findings on July 2, 2021.

10.     Finally, on October 18, 2021, over one year after Plaintiffs' and Class Members' PII was first exposed, and over three months after learning of the Data Breach, Defendant began notifying Plaintiffs and Class Members.

11.     Also on or around October 18, 2021, Defendant began notifying various states Attorneys General of the Data Breach.

12.     By obtaining, collecting, storing, using, and deriving a benefit from the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.  Defendant admits that the unencrypted PII exposed to "unauthorized activity" included names and Social Security numbers.

13.     The exposed PII of Plaintiffs and Class Members can be sold on the dark web. Hackers can access and then offer for sale the unencrypted, unredacted PII to other criminals. Plaintiffs and Class Members now face a lifetime risk of identity theft, which is heightened here by the loss of Social Security numbers. Plaintiffs have already experienced and will continue to experience various instances of fraud, as detailed herein, for years to come.

14.     This PII was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect the PII of Plaintiffs and Class Members.  In addition to

---

[4] *See* https://www.upguard.com/breaches/power-apps (last visited Jan. 25, 2022).

Defendant's failure to prevent the Data Breach, after discovering the breach, Defendant failed to timely report it to the states' Attorneys General and affected Class Members. Defendant has also purposefully maintained secret the specific vulnerabilities and root causes of the Data Breach and has not informed Plaintiffs and Class Members of that information.

15. As a result of Defendant's delayed notification, Plaintiffs and Class Members had no idea their PII had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

16. Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the PII of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts to negligence and violates federal and state statutes.

17. Plaintiffs and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, mitigation, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, and (iv) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain in Defendant's possession and is therefore subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

4

18.     Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that their PII was safeguarded. Defendant failed to take available steps to prevent the Data Breach and accompanying unauthorized disclosure of PII, and failed to follow applicable, required, adequate and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As the result, the PII of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party and remained at inappropriate risk of disclosure even before the Data Breach. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## II. PARTIES

19.     Plaintiff George Wilson is a resident and citizen of New Jersey.

20.     Plaintiff Thornell Brown is a resident and citizen of California.

21.     Plaintiff Aaron Fowler is a resident and citizen of Illinois.

22.     Plaintiff Casey Jenkins is a resident and citizen of Georgia.

23.     Plaintiff Curtis Simpkins is a resident and citizen of Texas.

24.     Plaintiff Charles Baker is a resident and citizen of Illinois.

25.     Defendant J.B. Hunt Transport, Inc. is a corporation organized under the laws of Georgia, headquartered in Lowell, Arkansas, with its principal place of business in Lowell, Arkansas.

26.     The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently

unknown to Plaintiffs.  Plaintiffs will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

27.     All of Plaintiffs' claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

### III. JURISDICTION AND VENUE

28.     This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendant to establish minimal diversity.

29.     The Western District of Arkansas has personal jurisdiction over Defendant named in this action because Defendant and/or its parents or affiliates are headquartered in this District and Defendant conduct substantial business in Arkansas and this District through its headquarters, offices, parents, and affiliates.

30.     Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant and/or its parents or affiliates are headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

### IV. FACTUAL ALLEGATIONS

*Background*

31.     Defendant is a freight and logistics company that operates in the United States, Canada and Mexico. Defendant has employed thousands of people.[5]

32.     In applying for jobs with Defendant, Plaintiffs and Class Members were required

---

[5] See https://www.jbhunt.com/our-company (last visited Jan. 18, 2022)

to provide Defendant with sensitive and confidential information, including their names and Social Security numbers, which include information that is static, does not change, and can be used to commit myriad financial crimes.

33.    Plaintiffs and Class Members relied on this sophisticated Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.  Plaintiffs and Class Members demand security to safeguard their PII.

34.    Defendant had a duty to take reasonable measures to protect the PII of Plaintiffs and Class Members from involuntary disclosure to third parties.

35.    Defendant has posted a Privacy Policy, last updated December 30, 2019, on its website (the "Privacy Policy").[6]

36.    The Privacy Policy "applies to personal information that we collect about you on this website, jbhunt.com (the 'Website') and to personal information that you submit to us or that we collect via online fillable forms, email or SMS campaigns, our mobile applications, software, or any other J.B. Hunt product or service that incorporates this Privacy Policy by reference."[7]

37.    Under "How We Protect the Information We Collect", the Privacy Policy states

> We have implemented technical, administrative, and physical security measures to protect your personal information from unauthorized access or disclosure and improper use. For example, we use 256-bit Secure Sockets Layer (SSL) encryption to protect the data collection forms on the Site. In addition, access to your personal information is restricted in our offices. Only employees who need the personal information to perform a specific job (for example, a customer service representative) are granted access to personal information. All employees with access to personal information are kept up-to-date on our security and privacy practices. After a new

---

[6] *See* https://www.jbhunt.com/privacy-policy.html (last visited Jan. 16, 2022).

[7] *Id.*

policy is added, these employees are notified and/or reminded about the importance we place on privacy, and what they can do to enhance protection for our customers' personal information. In addition, the servers that we use to store personal information are kept in a secure, restricted access area.[8]

### *The Data Breach*

38.     On or about October 18, 2021, Defendant sent Plaintiffs and Class Members "notice of an incident that involves some of your personal information" (the "Notice of Data Breach").[9] Defendant informed Plaintiffs and Class Members that:

> J.B. Hunt Transport, Inc. ("J.B. Hunt") understands the importance of protecting the information we maintain. We are writing to inform you of an incident that involves some of your personal information. This notice explains the incident, measures we have taken, and some steps you may consider taking in response.
>
> J.B. Hunt has completed its investigation into a security incident involving a configuration error in the Microsoft PowerApps portal used by J.B. Hunt to create driver applications. Upon learning of the incident, we immediately took steps to secure the portal. The investigation determined that certain applicant information could have been accessed by an unauthorized actor between August 17, 2020 through July 2, 2021. We completed a careful review of the data and, on September 10, 2021, determined that the files contained your name and Social Security number.
>
> We take this incident very seriously. J.B. Hunt is offering you a complimentary one-year membership to Experian's® IdentityWorks[SM]. This product helps detect possible misuse of your personal information and provides you with identity protection services focused on identification and resolution of identity theft. IdentityWorks is completely free to you and enrolling in this program will not hurt your credit score....
>
> We regret any inconvenience or concern this incident may cause you. To help prevent something like this from happening in the future, we have reviewed permissions to access data in the cloud, made modifications for all cloud services, and implemented other

---

[8] *Id.*

[9] Exhibit 1 (Notice of Data Breach sent to Plaintiff Wilson).

measures to help prevent unauthorized access to our data.[10]

39.     On or about October 20, 2021, Defendant notified various state Attorneys General of the Data Breach.  Defendant also provided the Attorneys General with "sample" notices of the Data Breach.[11]

40.     Defendant admitted in the Notice of Data Breach, the reports to the Attorneys General, and the "sample" notices of the Data Breach that unauthorized third persons could have accessed files that contained sensitive information about applicants for jobs with Defendant, including names and Social Security numbers.

41.     Defendant claims that "[u]pon learning of the incident, we immediately took steps to secure the portal" and that "[t]o help prevent something like this from happening in the future, we have reviewed permissions to access data in the cloud, made modifications for all cloud services, and implemented other measures to help prevent unauthorized access to our data."[12] However, to date, Defendant has not shared with regulators or Plaintiffs and Class Members, who retain a vested interest in ensuring that their information remains protected, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure a breach does not occur again.

42.     Indeed, Plaintiffs and Class Members learned critical information regarding the Data Breach from a third party company, UpGuard. UpGuard's Cyber Risk Research Team finds publicly exposed data, helps the owners secure it, and shares information on how these exposures

---

[10] *Id.* at 1.

[11] https://www.doj.nh.gov/consumer/security-breaches/documents/j-b-hunt-transport-20211020.pdf (last visited Jan. 18, 2022)

[12] Exhibit 1.

can be avoided.[13]

43.     On August 23, 2021, UpGuard published a report disclosing multiple data exposures resulting from Microsoft Power Apps portal configurations that allowed public access to sensitive PII.[14] Upon information and belief, Defendant collected driver applications through a Microsoft Power Apps portal but failed to configure the Microsoft Power Apps settings to ensure that PII remained private and not publicly accessible.

44.     Microsoft Power Apps are a product for making "low code", cloud-hosted business intelligence apps. Power Apps portals are a way to create a public website to "give both internal and external users secure access to your data." Users can create websites in the Power Apps UI with application capabilities like user authentication, forms for users to enter data, data transformation logic, storage of structured data, and APIs to retrieve that data by other applications. Portals provide a public website for interacting with those apps. Typically, a business unit or polity uses a portal as an interface with a closely-related audience like customers, sales partners, employees, or citizens.[15]

45.     As part of its report, UpGuard noted that product documentation for Power Apps described the conditions under which data can be made publicly accessible, and the main Power Apps marketing page listed the ability to access "your data either anonymously or through commercial authentication" as one of the top features.[16] Nevertheless, Defendant configured its Power Apps settings in such a way that continuously exposed the PII of Plaintiffs and Class Members to unauthorized persons over an eleven month period of time.

---

[13] *See* https://www.upguard.com/team/upguard (last visited Jan. 25, 2022).
[14] *By Design: How Default Permissions on Microsoft Power Apps Exposed Millions*, UpGuard, Aug. 23, 2021, *available at*: https://www.upguard.com/breaches/power-apps (last accessed Jan. 25, 2022).
[15] *Id.*
[16] *See Id.*

46.     Upon information and belief, Defendant did not take the manual steps to secure its's Power Apps portal, but rather left the configuration to the default setting, thus allowing anonymous access to lists and exposing PII as a result.

47.     According to UpGuard, Defendant was made aware of its configuration settings and the resulting Data Breach on July 2, 2021.

48.     Because of the configuration settings used by Defendant that allowed for unfettered access to Plaintiffs' and Class Members' sensitive information, the unencrypted PII of Plaintiffs and Class Members may end up for sale on the dark web, or fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and Class Members.  Unauthorized individuals can easily access the PII of Plaintiffs and Class Members.

49.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiffs and Class Members, causing the exposure of PII for more than 231,000 individuals.

***Defendant Acquires, Collects, and Stores the PII of Plaintiffs and Class Members.***

50.     Prior to the Data Breach, Defendant acquired, collected, and stored the PII of Plaintiffs and Class Members.

51.     As a condition of applying for employment with Defendant, Plaintiffs and Class Members entrusted Defendant with highly confidential PII.

52.     By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII from disclosure.

53.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and securely

11

maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### *Securing PII and Preventing Breaches*

54.     Defendant could have prevented this Data Breach by properly securing and encrypting the PII of Plaintiffs and Class Members.  Alternatively, Defendant could have destroyed the data, especially the PII of those who applied for jobs years before the Data Breach.

55.     Product documentation for Microsoft Power Apps alerted Defendant that there were conditions under which data could be made publicly accessible, and the main Power Apps marketing page listed the ability to access data either anonymously or through commercial authentication as one of the top features. Defendant ignored these warnings.[17]

56.     Defendant's policies on its website include promises and legal obligations to maintain and protect PII, demonstrating an understanding of the importance of securing PII. For example, Defendant's Privacy Policy provides in part that they "have implemented technical, administrative, and physical security measures to protect your personal information from unauthorized access or disclosure and improper use." The Policy goes on to state that "access to your personal information is restricted in our offices. Only employees who need [it] to perform a specific job are granted access to personal information."[18]

57.     Defendant's negligence in safeguarding the PII of Plaintiffs and Class Members is exacerbated by their own repeated pronouncements to Class Members that Defendant would protect and secure their sensitive data.

58.     Despite the prevalence of public announcements of data breach and data security

---

[17] *By Design: How Default Permissions on Microsoft Power Apps Exposed Millions*, UpGuard, Aug. 23, 2021, *available at*: https://www.upguard.com/breaches/power-apps (last accessed Feb. 28, 2022).
[18] https://www.jbhunt.com/privacy-policy (last visited Jan. 18, 2022).

compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

59.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[19] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[20]

60.    The ramifications of Defendant's failure to keep secure the PII of Plaintiffs and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

### Value of Personal Identifiable Information

61.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[21] Experian reports that a stolen credit or debit

---

[19] 17 C.F.R. § 248.201 (2013).

[20] *Id.*

[21] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed Jan.17, 2022).

card number can sell for $5 to $110 on the dark web.[22] Criminals can also purchase access to entire

company data breaches from $900 to $4,500.

62.     Social Security numbers, for example, are among the worst kind of personal

information to have stolen because they may be put to a variety of fraudulent uses and are difficult

for an individual to change. The Social Security Administration stresses that the loss of an

individual's Social Security number, as is the case here, can lead to identity theft and extensive

financial fraud:

> A dishonest person who has your Social Security number can use it
> to get other personal information about you. Identity thieves can use
> your number and your good credit to apply for more credit in your
> name. Then, they use the credit cards and don't pay the bills, it
> damages your credit. You may not find out that someone is using
> your number until you're turned down for credit, or you begin to get
> calls from unknown creditors demanding payment for items you
> never bought. Someone illegally using your Social Security number
> and assuming your identity can cause a lot of problems.[23]

63.     What is more, it is no easy task to change or cancel a stolen Social Security number.

An individual cannot obtain a new Social Security number without significant paperwork and

evidence of actual misuse. In other words, preventive action to defend against the possibility of

misuse of a Social Security number is not permitted; an individual must show evidence of actual,

ongoing fraud activity to obtain a new number.

64.     Even then, a new Social Security number may not be effective. According to Julie

Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the

---

[22] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec.
6, 2017, *available at*:  https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/  (last accessed Jan. 17, 2022).

[23] *Identity Theft and Your Social Security Number*, Social Security Administration, *available at*:
https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Jan. 13, 2021).

new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[24]

65.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, only credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.   The information compromised in this Data Breach, including Social Security number and name, is impossible to "close" and difficult, if not impossible, to change—.

66.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained: "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[25]

67.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

68.     The fraudulent activity resulting from the Data Breach may not come to light for years.

69.     There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data

---

[24] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last accessed Jan. 17, 2022).

[25] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Jan. 17, 2022).

> may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[26]

70.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members, including Social Security numbers, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

71.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

72.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's storage platform, amounting to potentially tens or hundreds of thousands of individuals' detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

73.     To date, Defendant has offered Plaintiffs and Class Members only twelve months of identity theft detection through a single credit bureau, Experian. The offered service is wholly inadequate to protect Plaintiffs and Class Members from the threats they face for years to come, particularly in light of the PII at issue here.

74.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of

---

[26] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last accessed Jan. 17, 2022).

Plaintiffs and Class Members.

### *Plaintiff George Wilson's Experience*

75.     Prior to the Data Breach, Plaintiff George Wilson submitted a job application to Defendant. As a condition of submitting such application, Defendant required that Plaintiff provide and/or entrust his PII, including his name and Social Security number.

76.     Plaintiff Wilson received Defendant's Notice of Data Breach, dated October 18, 2021, on or about that date.  The notice stated that Plaintiff Wilson's name and Social Security number were contained in files that could have been accessed during the Data Breach.

77.     As a result of the Notice of Data Breach, Plaintiff Wilson spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring his accounts. This time has been lost forever and cannot be recaptured.

78.     Additionally, Plaintiff Wilson is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

79.     Plaintiff Wilson stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

80.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff entrusted to Defendant for the purpose of applying for employment, which was compromised in and as a result of the Data Breach.

81.     Plaintiff Wilson suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

82.     Plaintiff Wilson has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, in combination with his name, being placed in the hands of unauthorized third parties and possibly criminals.

83.     Plaintiff Wilson has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Thornell Brown's Experience*

84.     Plaintiff Thornell Brown submitted a job application to Defendant in early 2020. As a condition of submitting that application, Defendant required that Plaintiff Brown provide and/or entrust his PII, including his name and Social Security number.

85.     On or about October 18, 2021, Plaintiff Brown received Defendant's Notice of Data Breach, which stated that his PII had been improperly accessed and/or obtained by unauthorized third parties. The notice further indicated that Plaintiff Brown's PII, including his Social Security number, was compromised as a result of the Data Breach.

86.     As a result of the Data Breach, Plaintiff Brown made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach; reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud; researching and signing up for credit monitoring and identity theft protection services offered by Defendant; and contacting creditors and credit bureaus. Plaintiff Brown has spent several hours dealing with the Data Breach, valuable time Plaintiff Brown otherwise would have spent on other activities, including but not limited to applying for work and/or recreation. This time has been lost forever and cannot be recaptured.

87.     Additionally, Plaintiff Brown is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

88.     Plaintiff Brown stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

89.     As result of the Data Breach, Plaintiff Brown has suffered emotional distress as a result of the release of his PII, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his PII for purposes of identity theft and fraud. Plaintiff Brown is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

90.     Plaintiff Brown suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his Private Information, a form of property that Defendant obtained from Plaintiff Brown; (b) violation of his privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

91.     As a result of the Data Breach, Plaintiff Brown anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Brown is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come

**Plaintiff Aaron Fowler's Experience**

92.     In 2020, prior to the Data Breach, Plaintiff Aaron Fowler submitted a job application to Defendant. As part of that process, Defendant required Plaintiff Fowler to provide

19

his PII to Defendant when he created an account to apply for employment.

93.     Plaintiff Fowler has never been employed by Defendant, yet Defendant continued to house Plaintiff Fowler's sensitive PII in its data systems.

94.     On or about October 18, 2021, Plaintiff Fowler received notice from Defendant that his PII had been improperly accessed and/or obtained by unauthorized third parties. This notice indicated that Plaintiff Fowler's PII, including his full name and Social Security number, was compromised as a result of the Data Breach.

95.     As a result of the Data Breach, Plaintiff Fowler has seen an increase in suspicious and "scam" telephone calls from unknown third parties who appear to have Plaintiff Fowler's PII. Plaintiff Fowler believes these suspicious telephone calls to be a result of the Data Breach.

96.     Also as a result of the Data Breach, Plaintiff Fowler has suffered actual injury in the form of unauthorized charges made on his bank account on two separate occasions.  Plaintiff Fowler had to cancel the applicable payment cards as a result of these unauthorized charges. Plaintiff Fowler believes these unauthorized charges to be a result of the Data Breach because he has not been notified that his PII was compromised in any other data breaches.

97.     As a result of the Data Breach, Plaintiff Fowler made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach; reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud; contacting creditors and credit bureaus, and contacting his bank concerning the unauthorized charges. Plaintiff Fowler has spent several hours dealing with the Data Breach, valuable time Plaintiff Fowler otherwise would have spent on other activities, including but not limited to applying for work and/or recreation.

98.     Plaintiff Fowler suffered actual injury from having his PII compromised as a result

of the Data Breach including, but not limited to (a) damage to and diminution in the value of his Private Information, a form of property that Defendant obtained from Plaintiff Fowler; (b) violation of his privacy rights; and (c) present, imminent and impending injury arising from the increased risk of further identity theft and fraud.

99.     Plaintiff Fowler is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

100.    Plaintiff Fowler stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

101.    As a result of the Data Breach, Plaintiff Fowler has suffered emotional distress as a result of the release of his PII, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his PII for purposes of identity theft and fraud. Plaintiff Fowler is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

102.    As a result of the Data Breach, Plaintiff Fowler anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Fowler is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### *Plaintiff Casey Jenkins's Experience*

103.    Plaintiff Casey Jenkins submitted a job application to Defendant in 2020. Defendant required Plaintiff Jenkins to provide his PII to Defendant when he created an account to apply for employment.

104.    Plaintiff Jenkins has never been employed by Defendant, yet Defendant continued

to house Plaintiff Fowler's sensitive PII in its data systems.

105.    On or about October 18, 2021, Plaintiff Jenkins received notice from Defendant that his PII had been improperly accessed and/or obtained by unauthorized third parties. This notice indicated that Plaintiff Jenkins' PII, including his full name and Social Security number, was compromised as a result of the Data Breach.

106.    As a result of the Data Breach, Plaintiff Jenkins has suffered actual injury in the form of identity theft when unknown third parties applied for a replacement Social Security number using his name and PII and applied for both auto and furniture loans using his name and PII. These loan applications have resulted in a substantial decrease in Plaintiff Jenkins's credit score. Moreover, unknown individuals attempted to rent a residence suing his name and PII.

107.    As a result of the identity theft detailed above, Plaintiff Jenkins was forced to place a "pause" on his credit. This pause resulted in Plaintiff Jenkins suffering a delay in in receiving a USDA grant.

108.    Plaintiff Jenkins made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach; reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud; researching and signing up for credit monitoring and identity theft protection services offered by Defendant; contacting creditors and credit bureaus, contacting the companies involved in the fraudulent attempts by unknown individuals to use his name and PII for unlawful gain. Plaintiff Jenkins has spent several hours dealing with the Data Breach, valuable time Plaintiff Jenkins otherwise would have spent on other activities, including but not limited to applying for work and/or recreation.

109.    Plaintiff Jenkins is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

110.    Plaintiff Jenkins stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

111.    Plaintiff Jenkins suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his Private Information, a form of property that Defendant obtained from Plaintiff Jenkins; (b) violation of his privacy rights; and (c) present, imminent and impending injury arising from the increased risk of further identity theft and fraud.

112.    As a result of the Data Breach, Plaintiff Jenkins has suffered emotional distress as a result of the release of his PII, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his PII for purposes of identity theft and fraud. Plaintiff Jenkins is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

113.    As a result of the Data Breach, Plaintiff Jenkins anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Jenkins is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### *Plaintiff Curtis Simpkins's Experience*

114.    Plaintiff Curtis Simpkins submitted a job application to Defendant in 2020. In order to apply, Defendant required Plaintiff Simpkins to provide Defendant with his PII.  Plaintiff Simpkins was employed with Defendant before 2020, but reapplied in 2020 to work with Defendant again.

115.    On or about October 18, 2021, Plaintiff Simpkins received Defendant's Notice of

Data Breach stating that his PII had been improperly accessed and/or obtained by unauthorized third parties. This Notice indicated that Plaintiff Simpkins' PII, including his full name and Social Security number, was compromised as a result of the Data Breach.

116.   Plaintiff Simpkins suffered actual injury resulting from the Data Breach. On or about December 26, 2020, Plaintiff Simpkins discovered that unknown third parties applied for unemployment benefits using his name and PII. When Plaintiff Simpkins attempted to apply for unemployment benefits himself, he was denied due to the previous, fraudulent application. Because of the identity theft he suffered, Plaintiff Simpkins had to prove his identity to the Social Security Administration ("SSA") and apply for and be issued a new Social Security number.

117.   Plaintiff Simpkins has experienced further identity theft in the form of receiving credit cards in the mail which he never applied for and which appear to have been requested by unknown third parties using his PII.

118.   As a result of the Data Breach and the associated fraud and identity theft, Plaintiff Simpkins made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach; reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud; contacting creditors and credit bureaus, contacting the SSA and applying for a new Social Security number, and contacting the companies sending him unsolicited credit cards. Plaintiff Simpkins has spent several hours dealing with the Data Breach, valuable time Plaintiff Simpkins otherwise would have spent on other activities, including but not limited to applying for work, working and/or recreation.

119.   Additionally, Plaintiff Simpkins is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

120.    Plaintiff Simpkins stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

121.    Plaintiff Simpkins suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his Private Information, a form of property that Defendant obtained from Plaintiff Simpkins; (b) violation of his privacy rights; and (c) present, imminent and impending injury arising from the increased risk of further identity theft and fraud.

122.    As a result of the Data Breach, Plaintiff Simpkins has suffered emotional distress as a result of the release of his PII, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his PII for purposes of identity theft and fraud. Plaintiff Simpkins is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

123.    As a result of the Data Breach, Plaintiff Simpkins anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Simpkins is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

***Plaintiff Charles Baker's Experience***

124.    In or about 2013, Plaintiff Charles Baker submitted a job application to Defendant. As a condition of submitting such application, Defendant required that Plaintiff provide and/or entrust it with his PII, including his name, mailing address and Social Security number.

125.    Following Plaintiff Baker's submission of his application, he was hired by

25

Defendant and remained employed with Defendant for under a year thereafter. Since that time, Defendant has continued to retain and store Plaintiff Baker's sensitive PII.

126.    Plaintiff Baker received Defendant's Notice of Data Breach, dated October 18, 2021, on or about that date. The notice stated that Plaintiff Baker's name and Social Security number were contained in files that could have been accessed during the Data Breach.

127.    As a result of the Notice of Data Breach, Plaintiff Baker spent time dealing with the consequences of the Data Breach, which includes numerous hours of time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring his accounts. Plaintiff Baker also froze his credit in response to the Data Breach using the services Equifax and Experian. This time has been lost forever and cannot be recaptured.

128.    Additionally, Plaintiff Baker is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

129.    Plaintiff Baker stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

130.    Plaintiff Baker suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff entrusted to Defendant for the purpose of applying for employment, which was compromised in and as a result of the Data Breach.

131.    Plaintiff Baker suffered numerous hours of lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

132.    Plaintiff Baker has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, in combination with his name, being placed in the hands of unauthorized third parties and possibly criminals.

133.    Plaintiff Baker has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## V. CLASS ALLEGATIONS

134.    Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

135.    The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All United States residents whose PII was or could have been accessed during the security incident that is the subject of the Notice of Data Breach that Defendant sent to Plaintiffs and other Class Members on or around October 18, 2021 (the "Nationwide Class").

136.    Plaintiff Brown also brings Claims under California law on behalf of himself and a California subclass defined as follows:

> All individuals residing in California whose PII was or could have been accessed during the security incident that is the subject of the Notice of Data Breach that Defendant sent to Plaintiffs and other Class Members on or around October 18, 2021 (the "California Subclass").

137.    Plaintiffs Fowler and Baker also bring a Claim under Illinois law on behalf of themselves and an Illinois subclass defined as follows:

> All individuals residing in Illinois whose PII was or could have been accessed during the security incident that is the subject of the Notice of Data Breach that Defendant sent to Plaintiffs and other Class Members on or around October 18, 2021 (the "Illinois Subclass").

27

138.    Plaintiff Jenkins also brings Claims under Georgia law on behalf of himself and a

Georgia subclass defined as follows:

>   All individuals residing in Georgia whose PII was or could have been accessed
>   during the security incident that is the subject of the Notice of Data Breach that
>   Defendant sent to Plaintiffs and other Class Members on or around October 18,
>   2021 (the "Georgia Subclass").

139.    Collectively, the Nationwide Class and California Subclass are referred to as the

Classes.

140.    Excluded from the Classes are the following individuals and/or entities: Defendant

and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which

Defendant has a controlling interest; all individuals who make a timely election to be excluded

from this proceeding using the correct protocol for opting out; any and all federal, state or local

governments, including but not limited to their departments, agencies, divisions, bureaus, boards,

sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this

litigation, as well as their immediate family members.

141.    Plaintiffs reserve the right to modify or amend the definition of the proposed classes

before the Court determines whether certification is appropriate.

142.    Numerosity, Fed. R. Civ. P. 23(a)(1): The Nationwide Class (the "Class") are so

numerous that joinder of all members is impracticable. Defendant has identified hundreds of

thousands of job applicants whose PII may have been improperly accessed in the Data Breach, and

the Class is apparently identifiable within Defendant's records.   Defendant advised Maine

Attorney General Frey that the Data Breach affected 231,687 individuals.

143.    Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact

common to the Classes exist and predominate over any questions affecting only individual Class

Members. These include:

    a.  Whether and to what extent Defendant had a duty to protect the PII of Plaintiffs and Class Members;

    b.  Whether Defendant had duties not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

    c.  Whether Defendant had duties not to use the PII of Plaintiffs and Class Members for non-business purposes;

    d.  Whether Defendant failed to adequately safeguard the PII of Plaintiffs and Class Members;

    e.  When Defendant actually learned of the Data Breach;

    f.  Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

    g.  Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their PII had been compromised;

    h.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    i.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

    j.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiffs and Class Members;

    k.  Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

l.   Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

m.   Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

144.   <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendant's misfeasance.

145.   <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Nationwide Class as a whole and to the California Subclass as a whole.  Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Classes each as a whole, not on facts or law applicable only to Plaintiffs.

146.   <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class.  Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they haves suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

147.   <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3): The class litigation is an

appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

148.   The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

149.   The litigation of the claims brought herein is manageable.  Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

150. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

151. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

152. Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

153. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a. Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

    b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

    c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

    d. Whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

    e. Whether Defendant breached the implied contract;

f.   Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiffs and Class Members; and,

i.   Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

### COUNT I
### NEGLIGENCE
#### (On Behalf of Plaintiffs and the Nationwide Class)

154.   Plaintiffs and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 133.

155.   As a condition of applying for jobs with Defendant, Plaintiffs and the Nationwide Class were obligated to provide Defendant with certain PII, including their names and Social Security numbers.

156.   Plaintiffs and the Nationwide Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

157.   Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Nationwide Class could and would suffer if the PII were wrongfully disclosed.

158.   Defendant knew or reasonably should have known that the failure to exercise due

care in the collecting, storing, and using of the PII of Plaintiffs and the Nationwide Class involved an unreasonable risk of harm to Plaintiffs and the Nationwide Class.

159.    Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, configuring, maintaining, and testing Defendant's security protocols to ensure that the PII of Plaintiffs and the Nationwide Class in Defendant's possession was adequately secured and protected.

160.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove job applicants' PII it was no longer required to retain pursuant to regulations.

161.    Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of the PII of Plaintiffs and the Nationwide Class.

162.    Defendant's duty to use reasonable security measures arose as a result of the relationship that existed between Defendant and Plaintiffs and the Nationwide Class.   That relationship arose because Plaintiffs and the Nationwide Class entrusted Defendant with their confidential PII, a necessary part of applying for jobs with Defendant.

163.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Nationwide Class.

164.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Nationwide Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

165.    Plaintiffs and the Nationwide Class were the foreseeable and probable victims of any inadequate security practices and procedures.  Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Nationwide Class, the critical

importance of providing adequate security of that PII, and the necessity for encrypting PII.

166.    Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and the Nationwide Class. Defendant's misconduct included, but was not limited to, its failure to properly configure its Microsoft Power Apps portal, which held Plaintiffs' and Class Members' sensitive PII, to disallow public access. Defendant's misconduct also included its decisions not to comply with industry standards for the safekeeping of the PII of Plaintiffs and the Nationwide Class, including basic encryption techniques freely available to Defendant.

167.    Plaintiffs and the Nationwide Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

168.    Defendant was in a position to protect against the harm suffered by Plaintiffs and the Nationwide Class as a result of the Data Breach.

169.    Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiffs and the Nationwide Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Nationwide Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

170.    Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiffs and the Nationwide Class.

171.    Defendant has admitted that the PII of Plaintiffs and the Nationwide Class was exposed to unauthorized third persons as a result of the Data Breach.

172.    Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and the Nationwide Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiffs and the Nationwide Class

during the time the PII was within Defendant's possession or control.

173.    Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Nationwide Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

174.    Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the PII of Plaintiffs and the Nationwide Class in the face of increased risk of theft.

175.    Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and the Nationwide Class by failing to have appropriate procedures in place to detect and prevent dissemination of job applicants' PII.

176.    Defendant breached its duty to exercise appropriate clearinghouse practices by failing to remove job applicants' PII it was no longer required to retain pursuant to regulations.

177.    Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiffs and the Nationwide Class the existence and scope of the Data Breach.

178.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Nationwide Class, the PII of Plaintiffs and the Nationwide Class would not have been compromised.

179.    There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiffs and the Nationwide Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Nationwide Class.  The PII of Plaintiffs and the Nationwide Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate

security measures.

180.    Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

181.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it collected and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Nationwide Class.

182.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

183.    Plaintiffs and the Nationwide Class are within the class of persons that the FTC Act was intended to protect.

184.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Nationwide Class.

185.    As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their

PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of Plaintiffs and the Nationwide Class; and (viii) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Nationwide Class.

186.    As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

187.    Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

188.    As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

189.    Plaintiffs and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 133.

190.    Defendant required Plaintiffs and the Nationwide Class to provide their personal information, including names and Social Security numbers, as a condition of applying for employment.

191.    As a condition of applying for employment with Defendant, Plaintiffs and the Nationwide Class provided their personal information.  In so doing, Plaintiffs and the Nationwide Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Nationwide Class if their data had been breached and compromised or stolen.

192.    Prior to the Data Breach, Defendant published its Privacy Policy, agreeing to (i) implement technical, administrative, and physical security measures to protect the PII from unauthorized access or disclosure and improper use, (ii) limit access to the PII to employees who need such access to perform a specific job, and (iii) store the PII only on servers kept in a secure, restricted access area.

193.    Plaintiffs and the Nationwide Class fully performed their obligations under the implied contracts with Defendant.

194.    Defendant breached the implied contracts it made with Plaintiffs and the Nationwide Class by (i) failing to implement technical, administrative, and physical security measures to protect the PII from unauthorized access or disclosure and improper (such as

encryption of Social Security numbers) despite such measures being readily available, (ii) failing to limit access to the PII to Defendant's employees who needed such ass to perform a specific job, (iii) failing to store the PII only on servers kept in a secure, restricted access area, and (iv) otherwise failing to safeguard the PII.

195.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs and the Nationwide Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

196.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

## COUNT III
### INVASION OF PRIVACY
**(On Behalf of Plaintiffs and the Nationwide Class)**

197.    Plaintiffs and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 133.

198.    Plaintiffs and the Nationwide Class had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

199.    Defendant owed a duty to its prospective, current, and former employees, including Plaintiffs and the Nationwide Class, to keep their PII contained as a part thereof, confidential. Defendant failed to protect and released to unknown and unauthorized third parties the PII of Plaintiffs and the Nationwide Class.

200.    Defendant allowed unauthorized and unknown third parties access to and examination of the PII of Plaintiffs and the Nationwide Class, by way of Defendant's failure to encrypt, secure, or delete the PII. The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiffs and the Nationwide Class is highly offensive to a reasonable person.

201.    The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiffs and the Nationwide Class disclosed their PII to Defendant as part of their prospective, current, and former employment with Defendant, but privately with an intention that the PII would be kept confidential and would be protected from unauthorized disclosure. Plaintiffs and the Nationwide Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

202.    The Data Breach at the hands of Defendant constitutes an intentional interference with Plaintiffs' and the Nationwide Class's interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

203.    Defendant acted with a knowing state of mind when they permitted the Data Breach to occur because they were with actual knowledge that its information security practices were inadequate and insufficient. Defendant was aware that its Microsoft Power Apps portal allowed for enhanced privacy settings, yet it maintained the "default setting" on its portal, which allowed

for unfettered access to Plaintiffs' and Class Members' PII. Because Defendant acted with this knowing state of mind, they had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiffs and the Nationwide Class.

204.    As a proximate result of the above acts and omissions of Defendant, the PII of Plaintiffs and the Nationwide Class was disclosed to third parties without authorization, causing Plaintiffs and the Nationwide Class to suffer damages.

205.    Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Nationwide Class in that the PII maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come, Plaintiffs and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs and Class Members.

## COUNT IV
### BREACH OF CONFIDENCE
**(On Behalf of Plaintiffs and the Nationwide Class)**

206.    Plaintiffs and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 133.

207.    At all times during Plaintiffs' and the Nationwide Class's interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiffs' and the Class Members' PII that Plaintiffs and Class Members provided to Defendant.

208.    As alleged herein and above, Defendant's relationship with Plaintiffs and the Nationwide Class was governed by terms and expectations that Plaintiffs' and the Nationwide Class's PII would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

209.    Plaintiffs and the Nationwide Class provided their PII to Defendant with the explicit and implicit understandings that Defendant would protect and not permit the PII to be disseminated to any unauthorized third parties.

210.    Plaintiffs and the Nationwide Class also provided their PII to Defendant with the explicit and implicit understandings that Defendant would take precautions to protect that PII from unauthorized disclosure. Defendant voluntarily received in confidence Plaintiffs' and Class Members' PII with the understanding that PII would not be disclosed or disseminated to the public or any unauthorized third parties.

211.    Due to Defendant's failure to prevent and avoid the Data Breach from occurring, Plaintiffs' and Class Members' PII was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and Class Members' confidence, and without their express permission.

212.    As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiffs and the Nationwide Class have suffered damages.

213.    But for Defendant's disclosure of Plaintiffs' and the Nationwide Class's PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendant's Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' PII as well as the resulting damages.

214.    The injury and harm Plaintiffs and the Nationwide Class suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiffs' and Class Members' PII. Defendant knew or should have known its methods of accepting and securing PII was inadequate as it relates to, at the very least, securing servers and other equipment containing Plaintiffs' and Class Members' PII.

215.    As a direct and proximate result of Defendant's breach of its confidence with Plaintiffs and the Nationwide Class, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual present and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of prospective, current, and former employees; and (viii) present and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

216.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

### COUNT V
### UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Nationwide Class)

217.    Plaintiffs and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 133.

218.    Defendant benefited from receiving Plaintiffs' and Class Members' PII by its ability to retain and use that information for its own benefit. Defendant understood this benefit.

219.    Defendant also understood and appreciated that Plaintiffs' and Class Members' PII was private and confidential, and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

220.    Plaintiffs and Class Members conferred a monetary benefit upon Defendant in the form of providing an ability to find people to employ, and in connection thereto, by providing their PII to Defendant with the understanding that Defendant would pay for the administrative costs of reasonable data privacy and security practices and procedures. Specifically, they were required to provide Defendant with their PII. In exchange, Plaintiffs and Class Members should have received adequate protection and data security for such PII held by Defendant.

221.    Defendant knew Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiffs and Class Members for business purposes.

222.    Defendant failed to provide reasonable security, safeguards, and protections to the PII of Plaintiffs and Class Members.

223.    Under the principles of equity and good conscience, Defendant should not be permitted to retain money belonging to Plaintiffs and Class members, because Defendant failed to implement appropriate data management and security measures mandated by industry standards.

224.    Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiffs and Class Members.

225.    Defendant's enrichment at the expense of Plaintiffs and Class Members is and was unjust.

226.   As a result of Defendant's wrongful conduct, as alleged above, Plaintiffs and Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

**COUNT VI**
**CALIFORNIA CONSUMER PRIVACY ACT**
**(On Behalf of Plaintiff Brown and the California Subclass)**

227.   Plaintiff Brown and the California Subclass re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 133.

228.   Defendant violated section 1798.150(a) of the California Consumer Privacy Act ("CCPA") by failing to prevent Plaintiff's and the California Subclass' unencrypted and unredacted PII from unauthorized access and exfiltration, theft, or disclosure as a result of Defendant's violations of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the PII.

229.   The PII of Plaintiff and the California Subclass was subjected to unauthorized access and exfiltration, theft, or disclosure as a direct and proximate result of Defendant's violation of its duty under the CCPA.

230.   Plaintiff and the California Subclass lost money or property, including but not limited to the loss of legally protected interest in the confidentiality and privacy of their PII, nominal damages, and additional losses as a direct and proximate result of Defendant's acts described above.

231.   Defendant knew, or should have known, that their network computer systems and data security practices were inadequate to safeguard PII and that the risk of a data breach or theft was highly likely. Defendant failed to implement and maintain reasonable, readily available security configurations and practices appropriate to protect PII, such as enabling basic privacy

46

settings and encrypting the PII so in the event of a data breach the PII cannot be read by an unauthorized third party. As a result of the failure to implement reasonable security procedures and practices, the PII of Plaintiff and members of the California Subclass was exposed.

232.    Defendant is organized for the profit or financial benefit of its owners and collects PII as defined in Cal. Civ. Code section 1798.140.

233.    Plaintiff and the California Subclass seek injunctive or other equitable relief to ensure that Defendant hereinafter adequately safeguards PII by implementing reasonable security procedures and practices. This relief is important because Defendant still holds PII related to Plaintiff and the California Subclass. Plaintiff and the California Subclass have an interest in ensuring that their PII is reasonably protected.

234.    On October 27, 2021, Plaintiffs' counsel sent a notice letter to Defendant's registered service agents via certified mail. Defendant responded on or about November 26, 2021 stating they cured the issue because they "implemented additional measures to cure the reported incident and imposed additional safeguards." This does not, however. "actually cure[]" []" the noticed violation, as required under § 1798.150(b). This is not a cure for PII already lost and provides no detail on how the stolen PII has been secured. Because Defendant has not "actually cur[ed]" the effects of the Data Breach, which would require retrieving the PII that has already been taken and/or securing the PII from continuing and future use, within 30 days, Plaintiff seeks actual damages and statutory damages of no less than $100 and up to $750 per customer record subject to the Data Breach on behalf of the California Subclass as authorized by the CCPA.

**COUNT VII**
**CALIFORNIA UNFAIR COMPEITION LAW**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of Plaintiff Brown and the California Subclass)**

235.    Plaintiff Brown and the California Subclass re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 133.

236.    By reason of the conduct alleged herein, Defendant engaged in unlawful and unfair business practices within the meaning of California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, *et seq.*

237.    Defendant stored the PII of Plaintiff and Class Members in its computer systems.

238.    Defendant knew or should have known it did not employ reasonable, industry standard, and readily available security measures that complied with federal regulations and that would have kept Plaintiff's and Class Members' PII secure and prevented the loss or misuse of that PII.

239.    Defendant did not disclose at any time that Plaintiff's and Class Members' PII was vulnerable to hackers because Defendant's data security measures were inadequate and outdated, and Defendant was the only one in possession of that material information, which Defendant had a duty to disclose.

### *Unlawful Business Practices*

240.    As noted above, Defendant violated Section 5(a) of the FTC Act (which is a predicate legal violation for this UCL claim) by misrepresenting, by omission, the safety of their computer systems, specifically the security thereof, and its ability to safely store Plaintiff's and Class Members' PII.

241.    Defendant also violated Section 5(a) of the FTC Act by failing to implement reasonable and appropriate security measures or follow industry standards for data security, by failing to ensure its affiliates with which it directly or indirectly shared the PII did the same, and by failing to timely notify Plaintiffs and Class Members of the Data Breach.

48

242.    If Defendant had complied with these legal requirements, Plaintiff and Class Members would not have suffered the damages related to the Data Breach, and consequently from Defendant's failure to timely notify Plaintiff and Class Members of the Data Breach.

243.    Defendant's acts and omissions as alleged herein were unlawful and in violation of, inter alia, Section 5(a) of the FTC Act.

244.    Plaintiff and Class Members suffered injury in fact and lost money or property as the result of Defendant's unlawful business practices. In addition, Plaintiff's and Class Members' PII was taken and is in the hands of those who have and will continue to use it for their own advantage, or is being sold for value, making it clear that the hacked information is of tangible value. Plaintiff and Class Members have also suffered consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

### *Unfair Business Practices*

245.    Defendant engaged in unfair business practices under the "balancing test." The harm caused by Defendant's actions and omissions, as described in detail above, greatly outweigh any perceived utility. Indeed, Defendant's failure to follow basic data security protocols and failure to disclose inadequacies of Defendant's data security cannot be said to have had any utility at all. All of these actions and omissions were clearly injurious to Plaintiff and Class Members, directly causing the harms alleged herein.

246.    Defendant engaged in unfair business practices under the "tethering test." Defendant's actions and omissions, as described in detail above, violated fundamental public policies expressed by the California Legislature. *See, e.g.*, Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to

them . . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendant's acts and omissions thus amount to a violation of the law.

247.   Defendant engaged in unfair business practices under the "FTC test." The harm caused by Defendant's actions and omissions, as described in detail above, is substantial in that it affects thousands of Class Members and has caused those persons to suffer actual harms. Such harms include a substantial risk of identity theft, disclosure of Plaintiff's and Class Members' PII to third parties without their consent, diminution in value of their PII, consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures. This harm continues given the fact that Plaintiff's and Class Members' PII remains in Defendant's possession, without adequate protection, and is also in the hands of those who obtained it without their consent. Defendant's actions and omissions violated Section 5(a) of the Federal Trade Commission Act. See 15 U.S.C. § 45(n) (defining "unfair acts or practices" as those that "cause[ ] or [are] likely to cause substantial injury to consumers which [are] not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition"); *see also*, *e.g., In re LabMD, Inc.*, FTC Docket No. 9357, FTC File No. 102-3099 (July 28, 2016) (failure to employ reasonable and appropriate measures to secure personal information collected violated § 5(a) of FTC Act).

248.    Plaintiff and Class Members suffered injury in fact and lost money or property as the result of Defendant's unfair business practices. Plaintiff and Class Members' PII was taken and is in the hands of those who will use it for their own advantage, or is being sold for value, making it clear that the hacked information is of tangible value. Plaintiff and Class Members have also suffered consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

249.    As a result of Defendant's unlawful and unfair business practices in violation of the UCL, Plaintiff and Class Members are entitled to damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT VIII
### ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
**815 Ill. Comp. Stat. §§ 510/2, *et seq.***
**(On Behalf of Plaintiffs Fowler and Baker and the Illinois Subclass)**

250.    Plaintiffs Aaron Fowler and Charles Baker and the Illinois Subclass re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 133.

251.    Defendant, Plaintiffs, and the Illinois Subclass are "persons" as defined by 815 Ill. Comp. Stat. §§ 510/1(5).

252.    Defendant engaged in deceptive trade practices in the conduct of its business, in violation of 815 Ill. Comp. Stat. §§ 510/2(a), including: (1) representing that goods or services have characteristics that they do not have; (2) representing that goods or services are of a particular standard, quality, or grade if they are of another; (3) advertising goods or services with intent not to sell them as advertised; (4) engaging in other conduct that creates a likelihood of confusion or misunderstanding.

51

253.    Defendant's deceptive trade practices include: (1) failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs and Illinois Subclass members' PII, which was a direct and proximate cause of the Data Breach; (2) failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures, which was a direct and proximate cause of the Data Breach; (3) failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs and Illinois Subclass members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a), which was a direct and proximate cause of the Data Breach; (4) misrepresenting that it would protect the privacy and confidentiality of Plaintiffs and Illinois Subclass members' PII, including by implementing and maintaining reasonable security measures; (5) misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs and Illinois Subclass members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a); (6) omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs and Illinois Subclass members' PII; and (7) omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs and Illinois Subclass members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a).

254.    Defendant's representations and omissions were material because they were likely to deceive reasonable employees and applicants about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' PII.

255.    The above unfair and deceptive practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury to Plaintiffs and Illinois Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to employees, applicants, consumers, or to competition.

256.    As a direct and proximate result of Defendant's unfair, unlawful, and deceptive trade practices, Plaintiffs and Illinois Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendant as they would not have applied for jobs with Defendant or would have demanded greater potential compensation but for Defendant's violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; time and money spent cancelling and replacing passports; loss of value of their PII; and an increased, imminent risk of fraud and identity theft.

257.    Plaintiffs and Illinois Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorney's fees.

### COUNT IX)
### GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT
#### Ga. Code Ann §§ 10-1-370, *et seq*.
#### (On Behalf of Plaintiff Jenkins and the Georgia Subclass)

258.    Plaintiff Casey Jenkins and the Nationwide Subclass re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 133.

259.    Defendant, Plaintiff, and the Georgia Subclass members are "persons" within the meaning of § 10-1-371(5) of the Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA").

260.    Defendant engaged in deceptive trade practices in the conduct of its business, in violation of Ga. Code of § 110-1-372(a) including: (1) representing that goods or services have

characteristics that they do not have; (2) representing that goods or services are of a particular standard, quality, or grade if they are of another; (3) advertising goods or services with intent not to sell them as advertised; (4) engaging in other conduct that creates a likelihood of confusion or misunderstanding.

261.    Defendant's deceptive trade practices include: (1) failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and Georgia Subclass members' PII, which was a direct and proximate cause of the Data Breach; (2) failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures, which was a direct and proximate cause of the Data Breach. (3) failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Georgia Subclass members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach. (4) misrepresenting that it would protect the privacy and confidentiality of Plaintiff and Georgia Subclass members' PII, including by implementing and maintaining reasonable security measures; (5) misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Georgia Subclass members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45; (6) omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff and Georgia Subclass members' PII; and (7) omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Georgia Subclass members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45.

262.    Defendant's representations and omissions were material because they were likely to deceive reasonable employees and applicants about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' PII.

263.    Defendant intended to mislead Plaintiff and Georgia Subclass members and induce them to rely on its misrepresentations and omissions.

264.    In the course of its business, Defendant engaged in activities with a tendency or capacity to deceive.

265.    Defendant acted intentionally, knowingly, and maliciously to violate Georgia's Uniform Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Georgia Subclass members' rights.  Past data breaches by similar companies put it on notice that its security and privacy protections were inadequate.

266.    Had Defendant disclosed to Plaintiff and Georgia Subclass Members that its data systems were not secure, Defendant would have been forced to adopt reasonable data security measures and comply with the law.  Instead, Defendant received, maintained, and compiled Plaintiff's and Georgia Subclass Members' PII as part of the application process for employment with JB Hunt.  Plaintiff and Georgia Subclass Members agreed to provide such information in exchange for the possibility of employment. Defendant failed to advise Plaintiff and Georgia Subclass Members that its data security practices were insufficient to maintain the safety and confidentiality of their PII.   Accordingly, Plaintiff and Georgia Subclass Members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

267.    As a direct and proximate result of Defendant's deceptive trade practices, Plaintiff and Georgia Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendant as they would not have applied for jobs with JB Hunt or would have demanded greater potential compensation; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; time and money spent cancelling and replacing passports; loss of value of their PII; and an increased, imminent risk of fraud and identity theft.

268.    Plaintiff and Georgia Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, and reasonable attorney's fees and costs, under Ga. Code § 10-1-373.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the Nationwide Class and appointing Plaintiffs and their Counsel to represent such Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

    iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII

of Plaintiffs and Class Members;

v.    prohibiting Defendant from maintaining the PII of Plaintiffs and Class Members on a cloud-based database;

vi.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.    requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.    requiring Defendant to conduct regular database scanning and securing checks;

xi.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii.    requiring Defendant to routinely and continually conduct internal training and

education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.   requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.   requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the

Court's final judgment;

D.      For an award of damages, including actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.      For prejudgment interest on all amounts awarded; and

G.      Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand that this matter be tried before a jury.

Date: March 1, 2022           Respectfully Submitted,

/s/*Francesca Kester*
Francesca Kester*
Jean Martin*
**MORGAN & MORGAN COMPLEX**
**BUSINESS DIVISION**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 223-5505
fkester@ForThePeople.com
jeanmartin@ForThePeople.com

Joseph Henry (Hank) Bates, III
David F. Slade
**CARNEY BATES & PULLIAM, PLLC**
519 W. 7th St.
Little Rock, AR 72201
Phone: 501-312-8500
Fax: 501-312-8505
hbates@cbplaw.com
dslade@cbplaw.com

M. Anderson Berry*
**CLAYEO C. ARNOLD,**
**A PROFESSIONAL LAW CORP.**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 239-4778
Facsimile: (916) 924-1829

aberry@justice4you.com

Myles McGuire**
David L. Gerbie**
Brendan Duffner**
**MCGUIRE LAW, P.C.**
55 W. Wacker Drive, 9th Fl.
Chicago, Illinois 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
dgerbie@mcgpc.com
bduffner@mcgpc.com

*Attorneys for Plaintiffs and the Proposed Class*

*pro hac vice*
**pro hac vice forthcoming*

## <u>CERTIFICATE OF SERVICE</u>

In compliance with the Administrative Policies and Procedures Manual for Civil and

Criminal Filings in the Western District of Arkansas, Plaintiffs' Consolidated Amended

Complaint is being emailed to the Clerk of Court for conventional filing pursuant to Section IV

and simultaneously copied to defense counsel of record.

*s/ Francesca Kester*
